## ROQUEMORE GRAVEL & SLAG CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 10094.

Circuit Court of Appeals, Fifth Circuit.

March 20, 1942.

Robert A. Littleton, of Washington, D. C., and Thos. B. Hill, Jr., and Wm. Inge Hill, both of Montgomery, Ala., for petitioner.

Benjamin M. Brodsky and J. Louis Monarch, Sp. Assts. to the Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., and J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue, and John W. Smith, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before FOSTER, SIBLEY, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

The taxpayer, Roquemore Gravel & Slag Company, in its income tax return for the calendar year 1936, showed a net income, after adjustment, of $33,883, and the Commissioner assessed tax on it as undistributed profits, denying the claim of credit based upon a written contract executed prior to May 1, 1936, whose provisions would be violated by distributing any profits during the taxable year. On a petition to redetermine the tax the Board of Tax Appeals held the contract was sufficient, but that it would not have been violated by distributing the profits on hand before a certain debt was incurred by taxpayer on Aug. 28, 1936. Because there was no specific evidence to the contrary, it further held that the entire profits for the year must be assumed to have been earned prior to August 28, and upheld the assessment as made.

On September 9, 1935, the taxpayer and another corporation in the same business and owned by the same persons

entered into a written contract whereby they pooled their businesses and agreed that all should be done in taxpayer's name for a year, "except that in the event the loan from Reconstruction Finance Corporation hereinafter provided for, or some other source is procured", the contract should continue till said loan shall have been paid in full. The contract provided that an effort should be made to borrow $70,000 for a time not less than five years, on a mortgage of all the assets of both corporations, to be used in acquiring certain other properties. Then follows the only express reference to not paying out profits or dividends: "In the event this loan is obtained, it is understood and agreed that from the proceeds of each and every order filled there shall be set aside and deposited in a sinking fund for the retirement of said loan the sum of five cents per ton, for each ton of sand or gravel sold and shipped, and it is further understood and agreed that all profit after payment of current operating expenses and of the carrying charges of Montgomery Gravel Company as hereinabove provided for, shall be applied in liquidation of said indebtedness, and for no other purpose; and it is further understood and agreed that no dividends shall be declared or paid by either of said companies until such time as said indebtedness shall have been discharged in full." Within the meaning of Section 26(c) (1) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 836, this is a written contract executed by the corporation prior to May 1, 1936, expressly dealing with the payment of dividends, and it entitles the taxpayer to a credit touching undistributed profits of such as could not have been distributed within the taxable year without violating the contract. The taxpayer contends that the true meaning of the provision is that no dividends at all were to be paid, if within a year from the date of the contract the loan was secured, but "all profit" must be applied in liquidation of the indebtedness; and since the loan was secured Aug. 28, 1936, well within the year, the claimed credit is fully established. We think the Board correctly concluded that the entire quoted sentence, and each of the three agreements in it, is qualified by the introductory words, "In the event this loan is ob-

tained." Until that occurred there was no obligation to create the sinking fund, to apply any profits to the debt, or to refuse to declare a dividend from them. "Said indebtedness" not being in existence, there was no reason to do either. If $33,000 in profits should be on hand Aug. 27, the taxpayer would probably borrow that much less than otherwise, but the contract did not prevent distributing this precedent profit and borrowing the full agreed amount.

■ It was argued orally that a subsequent provision of the contract which prohibits the incurring of "any obligation, other than current operating expenses, for more than $5,000" without the unanimous consent of the directors of both corporations, would be violated by declaring a dividend of more than $5,000. The declaration of a dividend does in a sense create an obligation to the shareholders, on which they may sue; but the wording of this part of the contract satisfies us that obligations to outsiders were meant, ordinary debts, and not dividends. Certainly so general a prohibition of all obligations would not satisfy the requirement of the statute that the contract shall "expressly [deal] with the payment of dividends."

But we are not content to assume that the whole profits of the year were made and distributable on August 27. The petition to the Board alleged that the ratable earnings from Jan. 1, 1936, to Aug. 28, 1936, were $22,185.61, and that $22,837.23 was available for dividends at that date. The answer by general denial controverted this. No evidence was introduced on the point. The figure $22,837.22 as actual profits is unproven, but the ratable figure of $22,185.61 proves itself, being the proper proportion of the year's established profits. The Board may be technically right about the burden of proof, but it seems to us so clearly just that a credit should be allowed with respect to profits earned after Aug. 28—actual if they are capable of proof, or ratable if that is the best measure available—that we exert our power to return the case to the Board with direction to reopen it for further evidence on this point, and a recomputation of the tax according to its finding thereon.

Remanded for further hearing.